## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **DIANE EBERLE**, | **Case No. 2:18-cv-1100** |
| Plaintiff, | |
| **v.** | **Judge Graham** |
| **AMERICAN ELECTRIC POWER SYSTEM LONG-TERM DISABILITY PLAN**, | **Magistrate Judge Deavers** |
| Defendant. | |

## OPINION AND ORDER

This action is filed by Diane Eberle, a former employee of American Electric Power ("AEP"), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover long-term disability ("LTD") benefits from the American Electric Power System Long-Term Disability Plan ("the Plan"). The Plan is administered by The Prudential Insurance Company of America ("Prudential"). AR 52.

Under the terms of the Plan, a participant is disabled in the first 24 months of a period of disability when the participant has "an illness or injury that requires the regular treatment of a duly qualified physician and that may reasonably be expected to prevent you from performing the material duties of your *own occupation* with AEP." AR 54 (emphasis added). After the first 24 months of a period of disability, a participant is disabled when they have "an illness or injury that requires the regular treatment of a duly qualified physician and that may reasonably be expected to prevent you from performing the duties of *any occupation* for which you are reasonably qualified by your education, training, and experience." AR 55 (emphasis added). Eligibility to

1

receive LTD benefits ends when the participant fails to submit satisfactory objective proof or refuses to undergo a requested examination by a physician. AR 59.

Plaintiff was employed by AEP as a store attendant. Her position involved duties related to store operations including picking up, hauling, and delivering materials. AR 36. Plaintiff's job required her to lift, lower, and carry objects weighing up to 70 pounds. AR 39. On April 22, 2015, Plaintiff applied for disability benefits citing lower back pain and right lower extremity weakness. AR 23. By letter dated July 13, 2015, Plaintiff was notified that she was approved for LTD benefits effective July 14, 2015 through January 31, 2016. AR 446. However, after completing a clinical file review and vocational consultation, Prudential advised Plaintiff by letter dated April 22, 2016 that her disability benefits would end July 30, 2016. AR 481. Plaintiff pursued an appeal from that decision and provided Prudential with additional information. AR 357, 376. Prudential engaged an independent medical examiner to review Plaintiff's file. By letter dated January 13, 2017, Prudential informed Plaintiff that the decision to terminate benefits was upheld. AR 492. Plaintiff pursued a second level of appeal on March 2, 2017. AR 400. Prudential had another independent medical examiner review Plaintiff's file. By letter dated March 29, 2017, Prudential informed Plaintiff that the decision to terminate benefits was again upheld. Plaintiff filed her complaint in the instant case on September 24, 2018. This matter is before the Court on cross-motions for judgment on the administrative record.

## I.     Standard of Review

The standard of review for a denial of benefits covered by ERISA varies. When the benefits plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the arbitrary and capricious standard applies. *See Cooper v.*

*Life Ins. Co. of N. America*, 486 F.3d 157, 164 (6th Cir. 2007). In all other circumstances, the court's review is de novo. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

The appropriate standard is not in dispute.[1] The Plan plainly gives Prudential "full discretion and authority to determine eligibility for benefits and for continued benefits and . . . full discretion and authority to construe and interpret all terms and provisions of the plan." AR 64. Accordingly, the Court will apply the arbitrary and capricious standard of review to Prudential's termination of Plaintiff's LTD benefits.

## II.  Prudential's Initial Decision to Deny Benefits

Prudential at first approved LTD benefits to Plaintiff, using the "own occupation" definition of disability. AR 517-18. But on April 22, 2016, it terminated benefits effective July 30, 2016 based on its conclusion that she did not meet the "any occupation" definition applicable to the period after the first 24 months of a period of disability. AR 481. This conclusion was based on Prudential's review of Plaintiff's file and the findings of a vocational consultant.

### A. *Review of Plaintiff's File*

Disability claims manager Thomas Mahan created a file on Plaintiff on June 1, 2015. AR 513. He determined that her date of disability was July 30, 2014. In advance of the end of the first 24-month period on July 30, 2016, Mahan took two actions. First, on February 4, 2016, he had a phone conversation with Plaintiff and noted that Plaintiff reported constant pain, could stand for five minutes only, could sit for thirty minutes only, required an assistive device, had difficulty maneuvering stairs, could carry no more than five pounds, was unable to perform chores, and did not drive. AR 523. Second, Mahan referred the matter for a file review by a clinical consultant, Registered Nurse Jill Cariglia.

---

[1] Plaintiff concedes that "AEP's plan appears to have delegated discretion to Prudential to construe the terms of the Plan and determine eligibility for benefits." Doc. 14 at 12.

Cariglia began her file review on March 10, 2016. AR 520. She reviewed the medical records already on file, which reflected that Plaintiff was a 48-year-old with a history of back and leg pain. In August 2014, Plaintiff met with Dr. Selvon St. Clair, an orthopedic and spinal surgeon at the Orthopedic Institute of Ohio, who determined that she had a disc herniation at L4-5, which was displacing the L5 nerve root and creating lateral recess stenosis. AR 103. Dr. St. Clair performed a L4-L5 bilateral laminectomy, partial medial facetectomy, foraminotomies of the L4 and L5 nerve, and right L4-L5 microdiscectomy to correct these issues on September 10, 2014. AR 105.

Three post-surgery follow-ups are reflected in the administrative record. Dr. St. Clair found Plaintiff to be improving on October 20, 2014 and permitted her to return to work with a fifty-pound weight restriction. AR 100. Certified Physician Assistant Steven Palte saw Plaintiff on November 10, 2014 and noted that "she is doing very well" but has "pain into the right greater trochanter." AR 98. Dr. St. Clair wrote on December 1, 2014 that he was "convinced that the patient should be able to return to work without any lingering troubles." AR 96-97.

On March 23, 2015, Plaintiff saw Certified Physician Assistant Caitline Logan for lower right-side lumbar pain. AR 94. Physician Assistant Logan ordered thoracic and lumbar MRIs. AR 95. She found the lumbar spine MRI showed mild foraminal stenosis and made the following assessments: (1) lumbar postlaminectomy syndrome, (2) spinal stenosis of the lumbar region with neurogenic claudication, (3) displacement of the lumbar disk, (4) radiculopathy of the lower extremity, (5) myelopathy of the thoracic region, (6) postlaminectomy syndrome, (7) fibromyalgia and (8) thoracic myelopathy. AR 92. Physician Assistant Logan referred Plaintiff to a rheumatologist to evaluate her fibromyalgia, recommended an epidural steroid injection, and recommended physical therapy for the lumbar and thoracic spine. AR 93. She gave Plaintiff a

return to work slip for light duty with the restriction that she have no prolonged standing. AR 98. The thoracic spine MRI later found no acute abnormalities and noted grade 1 anterior spondylolisthesis and mild spinal stenosis at T2-T3. AR 90, 118.

Plaintiff then had a nerve conduction test on March 24, 2015, from which the testing doctor concluded "[t]here is electrophysiologic evidence suggestive of mild, chronic right L5 radiculopathy." AR 124. The doctor further noted that "no active denervation was present in any muscle sampled to suggest an active process" and that "there is no definite electrophysiologic evidence of lumbosacral plexopathy or peripheral neuropathy in the lower right extremity." *Id.*

Plaintiff stopped attending work due to her pain in early April 2015. AR 20. She obtained a lumbar spine MRI on April 17, 2015. AR 118. The MRI impressions were that no acute abnormality was seen and there was grade 1 anterior spondylolisthesis and mild spinal stenosis at T2-T3 with no disc herniation or facture. AR 118. She saw Dr. William Leahy, her primary care physician, on April 22, 2015 and expressed frustration at her continued pain. AR 141. Dr. Leahy recommended Plaintiff get a second opinion from an orthopedic spine surgeon. AR 141. Dr. Leahy also, on April 30, 2015, completed a Certificate of Disability/Attending Physician Statement representing that Plaintiff could only sit for eight hours intermittently. AR 23.

Plaintiff saw Dr. Daryl Sybert, an orthopedic spine surgeon, for a second opinion on May 28, 2015. AR 115. His assessment was that Plaintiff has "[r]eccurrent right lower extremity radiculopathy with increased iliolumbar back pain with new onset of mid to lower thoracic pain." AR 173. He ordered a thoracolumbar myelogram and post-CT studies of the thoracic and lumbar regions. AR 173.

On June 10, 2015, Plaintiff received a CT of her lumbar and thoracic spine. The lumbar spine CT findings were as follows:

- The lumbar vertebral bodies are normally aligned. There are no compression fractures. No pars defects are noted. No suspicious osseous lesions are present.
- There are no gross abnormalities within the spinal canal. There is excellent opacification of the thecal sac by intrathecal contrast.
- On the axial images, at L1-L2, there are mild facet degenerative changes. There is no spinal canal or foraminal stenosis.
- At L2-3, there is a stable mild diffuse disc bulge with mild spinal canal stenosis. There are minimal facet degenerative changes. There is mild bilateral foraminal stenosis.
- At L3-4, there are mild facet degenerative changes. There is no focal disc abnormality. There is stable mild spinal canal stenosis. There is no foraminal stenosis.
- At L4-5, there has been prior posterior decompression laminectomy. There is no stenosis of the thecal sac. There are mild facet degenerative changes. There is no definite narrowing of the lateral recesses. There is mild bilateral foraminal stenosis greater on the right and the left.
- At L5-S1, there are severe facet degenerative changes in the left. There are milder right facet degenerative changes. There is no focal disc abnormality. There is no spinal canal stenosis. There is no foraminal stenosis.
- There are no suspicious findings in the visualized aspects of the retroperitoneum and paraspinal soft tissues.

AR 132-33. The thoracic spine CT showed mild degenerative disc disease throughout the thoracic spine without spinal canal or foraminal stenosis. AR 224.

On June 22, 2015, Dr. St. Clair completed a Capacity Questionnaire stating that Plaintiff could work part-time and would be able to work full-time in three to six months. AR 88. The Questionnaire reflected that Plaintiff could frequently climb stairs, climb ladders, balance, stoop, kneel/craw, reach desk level, and lift/carry up to fifty pounds and constantly reach overhead, right handle/finger, left handle/finger, lift/carry up to ten pounds, and lift/carry up to twenty pounds. AR 88.

Plaintiff had a follow-up appointment with Dr. Sybert on July 7, 2015. Dr. Sybert reviewed the post-CT studies of the thoracolumbar region and noted postoperative changes at the site of her prior L4-L5 laminectomy on the right and no significant recurrent stenosis in the lumbar or thoracic regions. AR 127. He also noted no soft tissue abnormalities and no evidence of neoplasia. AR 127.

Dr. Sybert reviewed Plaintiff's March 24, 2015 Electromyography and found it to show only chronic right L5 mild radiculopathy. Based on this review, he determined that Plaintiff was nonsurgical and suggested she get a neurology evaluation. AR 128.

Plaintiff saw Dr. Martin Taylor for a neurology evaluation on July 21, 2015. Dr. Taylor noted signs and symptoms consistent with L5 radiculopathy, peripheral restless leg syndrome in the right lower extremity, and bilateral scapulothoracic pain. AR 255. Dr. Taylor scheduled a follow-up appointment to see if a prescribed medication would control Plaintiff's symptoms. AR 255. During the follow-up on August 21, 2015, Dr. Taylor noted that the medication improved Plaintiff's pain slightly, but that the pain was still around a 5/10 in intensity and was constantly present. AR 159. Dr. Taylor prescribed a compound crème, performed trigger point injections, declined to recommend further physical therapy, and scheduled a follow-up appointment. AR 160.

On September 8, 2015, Plaintiff saw Dr. James Gideon, a rheumatologist, for her back and leg pain. AR 113. Dr. Gideon opined that Plaintiff had possibly failed back surgery, right L5-S1 radicular symptoms, and no neurological defects. AR 112. He theorized that "[q]uite a bit of her pain at this point is probably due to a residual antalgic gait." AR 112. He recommended Plaintiff do physical therapy to normalize her gate and strengthen her quadriceps and back. AR 112. He noted that Plaintiff did not clearly have radiculopathy or neuropathic symptoms and scheduled a follow-up appointment after gait training. AR 112.

Plaintiff saw Dr. Gideon again on October 8, 2015. AR 110. Dr. Gideon observed that Plaintiff continued to have an antalgic gait due to weakness and assessed that she had failed back surgery and chronic L5-S1 nerve damage leading to persistent pain, weakness, and disability; that she was not able to walk or stand any appreciable time; and that sedentary work was difficult for

her due to the distraction of neuropathic and musculoskeletal pain resulting from her nerve damage. AR 110. He deferred to Dr. Taylor for further evaluation. AR 110.

Plaintiff saw Dr. Taylor on October 13, 2015. AR 171. Dr. Taylor noted that Plaintiff's pain was 7/10 in intensity and that Plaintiff was having difficulty performing activities of daily independent living. AR 171. She also observed that Plaintiff's gait was antalgic. AR 172. Dr. Taylor recommended against physical therapy and stated that "[i]t would not be advisable [for Plaintiff] to work a full-time position that involved sitting or standing for prolonged periods of time . . ." due to pain, numbness in her right foot and sacral area, and stiffness. AR 172.

On November 9, 2015, Plaintiff returned to Dr. Gideon. AR 266. Dr. Gideon observed that Plaintiff continued to have back and right leg pain and that the "pain is pretty much unremitting, is worse with walking, worse with sitting, worse with most activity, and is quite distracting." AR 267. He assessed that Plaintiff is unable to meaningfully function in any capacity at work and that sitting, bending, reaching, lifting, and walking are painful after only a few minutes. AR 266. He opined that Plaintiff should get another surgical opinion based on a positive straight leg raise, but Plaintiff was reluctant to do so. AR 266.

On December 29, 2015, Plaintiff returned to Dr. Taylor. AR 174. Plaintiff reported to Dr. Taylor that her mobility had further decreased and her pain had increased to a 8/10 to 9/10 in intensity. AR 174. She also reported that she was using a walker and a shower chair and had continuing right foot pain and paresthesias as well as pain radiating from the right buttock down the leg. AR 174. Dr. Taylor recommended that Plaintiff use moist heat and Flexeril for her myofascial pain and oral steroids for her radiating right lower extremity pain. AR 175.

Upon review of Plaintiff's file, Cariglia noted that she had requested a Capacity Questionnaire from one of Plaintiff's physicians. On April 7, 2016, Dr. Gideon completed a

Capacity Questionnaire showing that Plaintiff could not work part-time or full-time and, "as things stand now" would never be capable of returning to full-time work. AR 343. The questionnaire reflects that Plaintiff could never climb ladders, balance, stoop, kneel/craw, lift/carry up to twenty pounds, and lift/carry up to fifty pounds and could occasionally reach desk level, reach overhead, right handle/finger, left handle/finger, and lift/carry up to ten pounds. AR 343.

On April 11, 2016, Cariglia updated her file review to include Dr. Gideon's Capacity Questionnaire. Cariglia reported her view that, based on Plaintiff's diagnostic and physical exam findings, along with the Questionnaire, Plaintiff had "at least [the] capacity for occasional reach at desk level and overhead, occasional lift/carrying up to 10 lbs and occasional right/left fingering/handling. Would also include that [Plaintiff] would have capacity for occasional stand walk and constant sit with the ability to change positions for comfort as needed." AR 524.

Claims Manager Mahan instructed Cariglia to clarify her report. She did so on April 19, 2016, stating that she believed that Plaintiff, at a minimum, had the capacities noted in Dr. Gideon's Questionnaire. Cariglia added that she believed, based on the available medical records, that Plaintiff had greater capacities than indicated with respect to her upper extremities, which were not impacted by Plaintiff's back and leg pain. Cariglia thought that Plaintiff likely had the capacity "for frequent reach at desk level and overhead and frequent right/left handling/finding." AR 526.

### B. *Vocation Review*

Mahan then instructed vocational consultant Kimberly Lewis to conduct an employment assessment. Lewis took note of the limitations found by Cariglia and recognized that Plaintiff has a college degree in business administration and marketing and has worked with AEP since 1989.

AR 526. In light of the capacities and limitations found by Cariglia, Lewis concluded that Plaintiff could perform the duties of a dispatcher, invoice control clerk, and order clerk. AR 527.

### C. *Prudential's Decision*

Prudential informed Plaintiff by letter dated April 22, 2016 that her LTD benefits would be terminated effective July 30, 2016. AR 479. The letter, signed by Mahan, explained that Prudential had conducted a clinical review of her file and, taking into consideration the restrictions and limitations determined during their review, found that Plaintiff could be gainfully employed as a dispatcher, invoice control clerk, or order clerk. AR 480-81. Each of these positions were categorized as sedentary.

Mahan noted specifically that the objective medical information did not support Plaintiff's reported level of capacity and pain. "You were reportedly referred for physical therapy for gait training, but stopped after four sessions. You were noted to be in severe pain, however you were reported to have capacity for occasional reaching at desk level, reaching overhead, occasional right and left hand fingering and feel, and lifting up to ten pounds." AR 481. Accordingly, Mahan concluded that Plaintiff did not meet the "any occupation" definition of disability. AR 481.

### III. **Plaintiff's First Appeal**

#### A. *Supplemental Records*

Plaintiff pursued an administrative appeal on October 14, 2016 challenging Prudential's termination of her LTD benefits. AR 357. Plaintiff provided two supplemental records as evidence of her disability status -- Dr. Gideon's August 26, 2016 Capacity Questionnaire and Dr. Gideon's September 10, 2016 letter. AR 376.

On August 26, 2016, Dr. Gideon completed another Capacity Questionnaire again showing that Plaintiff could not work full-time or part-time. AR 377. The questionnaire reflected that

Plaintiff could only sit for up to two hours a day and only in fifteen-minute increments. It also reflected that Plaintiff could never climb stairs, climb ladders, balance, stoop, kneel/craw, reach desk level, reach overhead, right handle/finger, left handle/finger, lift/carry up to ten pounds, lift/carry up to twenty pounds, or lift/carry up to fifty pounds. AR 377.

Dr. Gideon wrote a letter dated September 10, 2016 opining that Plaintiff "has adequate pain and symptoms as to render her unable to engage in gainful employment." AR 380. As support, he discussed two diagnoses. First, he opined that Plaintiff's back surgery failed. AR 379. He asserted that the permission to return to work with a fifty-pound lifting restriction was too lenient. AR 379. He also asserted that Plaintiff's right-side leg and ankle pain, which was worse after surgery, was consistent with nerve damage and causes her to fall or nearly fall. AR 379. Finally, he asserted that Plaintiff had back pain that was particularly tender over the surgical site. AR 379.

Second, Dr. Gideon opined that Plaintiff had fibromyalgia with diffuse soft tissue pain presumably caused by surgical injury, residual weakness causing an antalgic gait, and possibly constrictive radiculopathy based on a positive straight leg raise. AR 379. Dr. Gideon asserted that he tried to address these issues with injections, pain medication, and sleep, but was unsuccessful at addressing the post-surgical leg and back pain. Based on these findings, Dr. Gideon opined that "I emphatically don't think she will recover full function and will continue to have radicular pain exacerbated [by] physical activity limiting her ability to stand[,] walk left and work at a job requiring appreciable physical exertion standing and walking or even sitting." AR 379.

B. *File Review and Report of Dr. Graham*

Prudential had Dr. Todd Graham, an independent physician board-certified in pain medicine and physical medicine and rehabilitation, review Plaintiff's file, including the newly provided documents, and prepare an advisory report. Dr. Graham reviewed and summarized the

11

medical documents already discussed in this opinion. AR 383-88. He attempted on three occasions to reach Dr. Gideon to discuss Dr. Gideon's conclusions, but was only able to reach his assistant. AR 389. Dr. Gideon's assistant told Dr. Graham that Dr. Gideon had not changed his opinions reflected in his September 10, 2016 letter. AR 389.

> Dr. Graham noted the following objective test results:
>
> - The March 24, 2015 EMG showed evidence suggestive of mild, chronic L5 radiculopathy, no active denervation, no definite electrophysiologic evidence of lumbosacral plexopathy or peripheral neuropathy in the right lower extremity;
> - The June 10, 2015 CT of the lumbar spine showed mild bilateral foraminal stenosis greater on the right than the left at the L4-5 level due to disc material in the intra aspect of the neural foramen, mild spinal canal stenosis at the L3-4 level, and mild bilateral foraminal stenosis at the L2-3 level;
> - The June 10, 2015 CT of the thoracic spine showed mild degenerative disc disease throughout the thoracic spine without spinal canal or foraminal stenosis at any level.

AR 389-90. He concluded that:

> The findings support only mild radiculopathy and mild stenosis in the lumbar spine. Examination results showed no objective strength deficits and mild sensory deficits in right foot. No stenosis or abnormalities in thoracic spine were noted. As a result, this reviewer would base functional limits on the objective data available. As the claimant's diagnoses described above are not supported as being as severely impairing by objective findings on clinical evaluation, history, diagnostic nerve testing, MRI films, x-ray films and/or other studies they become somewhat nebulous disorders, in this regard. The diagnoses appear to be primarily supported by subjective reports. Because the claimant, with a chronic type pain syndrome has symptoms but relatively minimal objective documentation via films, tests, etc., there is limited objective medical basis upon with to predicate work restrictions or accommodations.

AR 390. Dr. Graham found that Plaintiff required the following limitations:

> - May sit for two hours at one time, for a total of six hours per eight-hour day;
> - May stand one hour at a time for a total of six hours per eight-hour day;
> - May walk for one hour at a time for a total of six hours per eight-hour day;
> - Is able to alternate sitting, walking, and standing activities as noted;
> - May lift, carry, push and pull up to forty pounds occasionally and up to ten pounds frequently;
> - May occasionally climb stairs;
> - May not climb ladders or work at heights;
> - May use upper extremities for gripping, grasping, handling, keying, fine/gross manipulation, and fingering without limits;

- May reach at waist height without limits;
- May reach above waist height without limits;
- May reach occasionally below waist level;
- May crouch, craw, stoop, kneel, bend, and squat occasionally;
- May work eight hours per day, forty hours per week with the above limitations.

AR 390-91.

Dr. Graham explained that he disagreed with Dr. Gideon's August 26, 2016 Capacity Questionnaire and September 10, 2016 letter based on his review of the objective evidence and because Dr. Gideon's statements were contrary to Dr. St. Clair's statements on Plaintiff's abilities. AR 392. He also explained that he disagreed with Cariglia's assessment of Plaintiff's abilities because there was no clinical documentation of issues necessitating limiting lifting/carrying to ten pounds, limiting upper extremity reaching at waist level and overhead, limiting handling, and limiting fingering to frequent. AR 392-93.

C. *Vocation Review*

Lewis did an assessment based on the limitations suggested by Dr. Graham. She found that Plaintiff could still perform the duties of a dispatcher, invoice control clerk, and order clerk. AR 529-30.

D. *Prudential's Decision*

Prudential notified Plaintiff by letter dated January 13, 2017 that it upheld its decision to terminate Plaintiff's LTD benefits. AR 495. The letter explained that Prudential had a physician reviewer review the medical records, including Dr. Gideon's August 26, 2016 Capacity Questionnaire and September 10, 2016 letter, and opine on the necessary restrictions and limitations. AR 493. The letter expanded that:

> The physician reviewer opined Ms. Eberle does have medically necessary restrictions or limitations from July 30, 2016 forward. He noted that Ms. Eberle is status post lumbar surgery with documented L5 radiculopathy. She has not had much response to physical therapy, chiropractic treatment, injections or medications. Additional surgery is not an option. She subjectively reports severe

pain and debility, and inability to complete activities of daily living independently, the need for a walker/wheelchair/cane to ambulate and inability to sit, stand, walk for longer than a few minutes and inability to lift/carry.

The physician reviewer noted the objective test and image results showed there was electrophysiologic evidence suggestive of mild, chronic right L5 radiculopathy. No active denervation was present in any process. In addition, there was no definite electrophysiologic evidence of lumbosacral plexopathy or peripheral neuropathy in the right lower extremity. The June 10, 2015 CT of the lumbar spine showed: mild bilateral foraminal stenosis greater on the right [than] the left at the L4-5 level due to disc material in the intra aspect of the neural foramen; mild spinal canal stenosis at the L3-4 level; mild bilateral foraminal stenosis at the L2-3 level. The June 10, 2015 CT of the thoracic spine showed mild degenerative disc disease throughout the thoracic spine without spinal canal or foraminal stenosis at any level.

It was the opinion of the physician reviewer that the findings support only mild radiculopathy and mild stenosis in the lumbar spine. Examination results showed no objective strength deficits and mild sensory deficits in right foot. No stenosis or abnormalities in thoracic spine were noted. He noted Ms. Eberle's diagnoses are not supported as being severely impairing by findings on clinical evaluation, history, diagnostic nerve testing, MRI films, x-ray films and/or other studies. The diagnoses appear to be primarily supported by subjective reports. Because she has chronic type pain syndrome symptoms but relatively minimal objective documentation via films, tests, etc., there is limited medical basis upon which to predicate work restrictions or accommodations.

. . .

With regard to the restrictions opined by [] Dr. Gideon, the physician reviewer contacted Dr. Gideon's office. He spoke with an assistant who stated the last documentation from Dr. James Gideon was the letter dated September 10, 2016. Dr. James Gideon has not seen Ms. Eberle since that date and no changes have been made with regard to the opinions in that note. No additional visits are currently on Dr. James Gideon's schedule. The physician reviewer stated he did not agree with the restrictions noted by Dr. Gideon for the reasons outlined above. In addition, to those details, he noted Ms. Eberle's treating surgeon released her to much more significant functional activity, in the medical records reviewed.

AR 493-94.

The letter continued that the vocational consultant considered these restrictions and limitations and opined again the Plaintiff could be gainfully employed as a dispatcher, invoice control clerk, or order clerk. AR 494.

### IV.    Plaintiff's Second Appeal

Plaintiff pursued a second level of appeal on March 2, 2017 without providing additional medical evidence. AR 400.

### A.  File Review and Report of Dr. Chemaly

Prudential had an independent, external file reviewer, Philippe Chemaly, Jr., board-certified in physical medicine and rehabilitation, review Plaintiff's file. AR 282. Dr. Chemaly reviewed and summarized the medical records. AR 274-80. He noted that diagnostic testing showed only "mild stenosis including a mild chronic radiculopathy with only mild right lower extremity sensory deficit with no motor weakness . . . ." AR 281. He opined that Plaintiff requires the following restrictions and limitations:

- Allowance for symptom relieving position break every hour for five minutes for a total of six hours per day;
- May stand and walk with allowance for symptom relieving position break every hour for a total of four hours combined per eight-hour day;
- May lift, carry, push, and pull up to forty pounds occasionally and up to ten pounds frequently;
- May occasionally climb stairs;
- May not climb ladders or work at heights with grasping, gripping, and handling;
- May use keyboard and do fine/gross manipulation fingering;
- May reach at waist and above shoulder level;
- May occasionally reach at below waist level;
- May occasionally crouch, crawl, stoop, kneel, bend, and squat.

AR 280-81.

Dr. Chemaly stated that the CT and electrodiagnostic results and other medical records "support impairment of increased LBP [lower back pain] and LE [lower extremity] pain with prolonged activities. AR 281. However, Dr. Chemaly explained that he disagreed with Dr. Gideon's August 26, 2016 Capacity Questionnaire and September 10, 2016 letter because the restrictions in both were "not medically supported" and that the records "support[] greater functionality with no motor weakness." AR 281. He also explained that he reviewed Dr. Graham's

report and agreed with Dr. Graham's assessment, except that he believed the mild lumbar stenosis and chronic radiculopathy require symptom relieving position breaks every hour instead of every two and walking/standing for up to four hours per day instead of six. AR 281.

### B. Vocation Review

Prudential had Lewis review the occupations Plaintiff could hold based on the restrictions recommended by Dr. Chemaly. Lewis concluded that Plaintiff could still perform the duties of a dispatcher, invoice control clerk, and order clerk. AR 533.

### C. Prudential's Decision

Prudential informed Plaintiff by letter dated March 28, 2017 that it again upheld the termination of Plaintiff's LTD benefits. AR 506. The letter explained that Prudential had a second physician reviewer conduct a de novo review of the medical records and opine on the necessary restrictions and limitations. AR 505. The letter expanded:

> It was further opined [that] Dr. Gideon's restrictions and limitations and opinion [that] Ms. Eberle is unable to work, was not medically supported with over[all] records. Diagnostic testing has only noted mild stenosis including a mild chronic radiculopathy with only mild right lower extremity sensory deficit with no motor weakness. . . .
>
> The physician-reviewer evaluated the file review completed on first reconsideration and opined they agreed with the assessment and rationale with the exception of allowance for symptom relieving position break every hour instead of every two hours and limiting walking and standing up to four hours per day instead of six hours per day [because,] although mild, lumbar stenosis is noted on Computed Tomography (CT) with a chronic radiculopathy on electrodiagnostic testing.
>
> AR 505-06.

The letter further explained that Prudential's vocational consultant considered the second physician reviewer's conclusion and again found that Plaintiff could be gainfully employed as a dispatcher, invoice control clerk, or order clerk. AR 505.

## V.    Review of Prudential's Decision

In reviewing Prudential's decision to terminate Plaintiff's LTD benefits, this Court applies the arbitrary and capricious standard of review. Courts applying the arbitrary and capricious standard must "decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on evidence, for a particular outcome, that outcome is not arbitrary or capricious." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (citation omitted). The plan administrator's decision must be upheld if it resulted from a "deliberate, principled reasoning process and if it is supported by substantial evidence." *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991).

Review of the plan administrator's decision is limited to the administrative record. *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (citation and quotation omitted). Both the quality and quantity of medical evidence and opinions on both sides of the issues must be considered. *McDonald*, 347 F.3d at 172.

Plaintiff raises several concerns with Prudential's decision to terminate Plaintiff's LTD benefits. These concerns consist of (A) the process by which the decision was made and (B) the substance of opinions on which Prudential relied.

### A.  Decision-Making Process

In deciding to terminate Plaintiff's LTD benefits, Prudential had physician reviewers evaluate the appropriate restrictions and limitations appropriate for Plaintiff based on the objective medical evidence. Prudential then had its vocational consultant determine whether Plaintiff, with those restrictions and limitations and considering her education and experience, could perform the duties of any occupation. Plaintiff takes issue with Prudential's use of the physician reviewers.

Plaintiff first asserts that Prudential's physician reviewers, Dr. Graham and Dr. Chemaly, lack the necessary expertise to opine on her condition. Doc. 14 at 13. She claims that an orthopedic surgeon and neurologist should have been consulted to evaluate her nerve damage and a rheumatologist to evaluate her fibromyalgia, obesity, and pain in upper extremities. Doc. 14 at 13.

The failure to consult with doctors of a relevant expertise is an indicator that the underlying decision was arbitrary and capricious. *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610 (6th Cir. 2016). However, examination by the narrowest of specialists is not required. *Id.* Plaintiff offers no support for asserting that Dr. Graham and Dr. Chemaly lack relevant expertise. Dr. Graham is board-certified in pain medicine and physical medicine and rehabilitation and is licensed in Indiana and Michigan. AR 396. Dr. Chemaly is board-certified in physical medicine and rehabilitation with an added expertise in pain medicine and is licensed in New Jersey, Florida, and New York. AR 282. Dr. Chemaly also attested that he has "the scope of licensure and certification that typically manages the medical condition, procedure, treatment, or issue under review." AR 282. The Court concludes that Prudential's physician reviewers were qualified to opine on Plaintiff's condition, which raised issues concerning physical capacities and pain.

Next, Plaintiff faults Prudential for relying on file reviews instead of conducting a physical examination. Doc. 14 at 18. She asserts that a physical examination was necessary because Dr. Graham made a credibility determination by disregarding her subjective complaints of pain. Doc. 14 at 16.

"There is nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Helfman v. GE Grp. Life Assur. Co.*, 573 F.3d 383, 393 (6th Cir. 2009) (citation omitted). However, the decision to not conduct a physical examination when the LTD plan specifically reserves to the administrator a right to "raise[s] questions about

18

the thoroughness and accuracy of the benefits determination." *Id.* (citations omitted). Credibility determinations made without a physical examination may also support a conclusion that the decision was arbitrary. *Id.* at 395-96.

In *Helfman*, the plan "specifically reserved the right, at its own expense, 'to have any person, whose Injury or Sickness is the basis of a claim . . . examined by a Physician, other health professional or vocational expert of its choice.'" *Id.* at 393. This specific reservation made clear the plan administrator's intention to use a physical examination in the benefits determination process. *See id*. The Sixth Circuit found that the plan administrators' failure to conduct the examination therefore brought into question the thoroughness of the benefit determination. *Id.* Here, in contrast, The Plan does not specifically reserve the right for Prudential to perform a physical examination to make a benefits determination.

Moreover, the Court disagrees that Dr. Graham's statement required a physical examination. Dr. Graham allegedly questioned Plaintiff's credibility by writing that "despite the relatively mild findings on objective test and images, the claimant continues to complain of severe (7-9/10) pain . . . ." Doc. 14 at 16.  To the extent that Dr. Graham questioned the credibility of Plaintiff's subjective assessment of pain, he properly placed primary importance on the objective medical records. The parties agree that the Plan called for objective medical evidence: "[y]our eligibility to receive LTD benefits ends . . . [t]he date you fail to submit satisfactory, written proof of objective medical information relating to your illness or injury which supports a functional impairment that renders you to be disabled." Doc. 14 at 14, 16 at 4; AR 59. Dr. Graham properly placed primary consideration on objective evidence and did not act in an arbitrary or capricious fashion by placing greater weight on the objective evidence where Plaintiff's subjective complaints were to the contrary. *See Curry v. Eaton Corp.*, 400 F. App'x 51, 66-67 (6th Cir. 2010) (concluding

"[t]o the extent that a finding of 'disabled' can only be based on objective evidence, and subjective complaints of pain and physical limitation are not considered, credibility would not seem to make a difference one way or another.")

Finally, Plaintiff questions the objectivity of the physician reviewers' reports. Doc. 17 at 12. Though Plaintiff's briefing does not adequately develop this argument, the Court understands Plaintiff to assert that the physician reviewers acted under a conflict of interest and that Dr. Chemaly inappropriately deferred to Dr. Graham's report. *See* Doc. 17 at 12. Both of these arguments miss the mark. A conclusory allegation that a physician reviewer is biased, without statistical evidence that the reviewer consistently opines that claimants are not disabled, does not mean that it is arbitrary and capricious for the plan to rely on the reviewer's opinion. *Curry*, 400 F. App'x at 66 (citation omitted). Plaintiff presents no such statistical evidence for Dr. Graham or Dr. Chemaly. Moreover, the Court notes that Dr. Graham and Dr. Chemaly are independent file reviewers who attested to not having a conflict of interest. AR 282, 396. As for Dr. Chemaly's consideration of Dr. Graham's report, Dr. Chemaly's report demonstrates that he made a full, independent review of the medical records. AR 274-82. In fact, he recommended slightly greater restrictions and limitations than Dr. Graham. AR 281. The Court thus finds that Dr. Chemaly did not improperly rely on Dr. Graham's report.

### B. Substance of Review

Prudential relied heavily on the conclusions of its physician reviewers in upholding its decision to terminate Plaintiff's LTD benefits. Plaintiff argues that this reliance was misplaced. More specifically, she asserts that Prudential should have credited the opinions of Plaintiff's

treating physicians and that both physician reviewer reports contained numerous errors and omissions.

A plan administrator's decision to rely on the medical opinion of one doctor over that of another is not arbitrary and capricious if it is possible to offer a reasoned explanation, based on the evidence, for the decision. *McDonald*, 347 F.3d at 169 (citation omitted). Prudential and its file reviewers accepted much of the medical opinions presented. On initial review, Cariglia expressed disagreement only with Dr. Gideon's conclusion that Plaintiff could only occasionally reach at desk level, reach overhead, right/left hand/finger, could not stand, and could not walk. AR 526. Cariglia found that Plaintiff has capacity "for frequent reach at desk level and overhead and frequent right/left handing/fingering as all of [Plaintiff] pain and symptoms are related to her back and lower extremities, [Plaintiff's] upper extremities are not affected based on [her] complaints" and that she can occasionally stand and walk and constantly sit with the ability to change positions for comfort as needed.  AR 526. Prudential, in its April 22, 2016 decision letter, credited Cariglia's conclusion. AR 479.

On the first appeal, Dr. Graham extensively reviewed and summarized Plaintiff's medical history. AR 383-288. He accepted that physical therapy, injections, and medications have not provided Plaintiff much relief, that surgery is not an option, and that Plaintiff reports severe pain, debility, and the inability to complete activities of daily living independently. AR 389. He relied on, without questioning, the results of the March 24, 2015 electromyography and the June 10, 2015 CT of Plaintiffs' lumbar and thoracic spine. AR 389. He concluded that the "findings support only mild radiculopathy and mild stenosis in the lumbar spine."  AR 390. He found that, based on her own medical records, Plaintiff was able to perform functions Dr. Gideon determined she could

not. 391. Prudential evaluated the medical information and credited Dr. Graham's conclusion. AR 494.

On the second appeal, Dr. Chemaly summarized and credited the medical evidence presented. Doc. 274-80. He concluded that "[d]iagnostic testing has only noted mild stenosis including a mild chronic radiculopathy and with only mild right lower extremity sensory deficit with no motor weakness . . . ." AR 281. Dr. Chemaly determined that Plaintiff could perform functions which Dr. Gideon found she could not. AR 280-81. Dr. Chemaly explained that his conclusion differed from Dr. Gideon's because Dr. Gideon's was not supported by the medical evidence. AR 281. Prudential evaluated the medical information and credited Dr. Chemaly's conclusion. AR 505.

The Court concludes from the above that Prudential did not act in an arbitrary or capricious manner in declining to rely on the opinions of Dr. Gideon because those opinions are not supported by medical evidence. The reports of Dr. Graham and Dr. Chemaly and the decision letters articulated the reasons why Dr. Gideon's opinions were not fully credited. The Court finds that it was permissible for Prudential to not credit Dr. Gideon's opinions because the lack of objective evidence supporting the treating physicians' opinions is generally adequate reason to not credit the physician's opinion. *See Boone v. Liberty Life Assur. Co. of Bos.*, 161 F. App'x 469, 473 (6th Cir. 2005)..

Plaintiff asserts that the physician reviewer reports contain errors and omissions which render them unreliable. Perhaps Plaintiff's strongest potential argument on this front is that Dr. Graham and Dr. Chemaly overlooked a crucial piece of objective evidence – the June 10, 2015 lumbar spine CT finding of severe facet degenerative changes at L5-S1. Doc. 14 at 15. The June 10, 2015 CT report is comprised of a findings section and an impression section. AR 132-33. The

severe facet degenerative changes is noted only in the findings section. Dr. Graham's report discusses only the impression section and so omits any discussion of the severe facet degenerative changes. Dr. Chemaly's report also fails to specifically address the severe facet degenerative changes.

The Court is not persuaded that Dr. Graham and Dr. Chemaly overlooked this finding, however. The CT was considered at all levels of review -- Cariglia noted it during the initial review, AR 521; Dr. Graham noted it at three points in his report, AR 383-84, 390, 393; Prudential noted it in its first appeal decision, AR 493; and Dr. Chemaly noted it at three points in his report, AR 275, 276-77, 279. That the severe facet degenerative changes did not warrant mention in the physician reviewers' reports is unsurprising. No doctor, including Plaintiff's treating physicians, referenced the severe facet degenerative changes when treating Plaintiff or opining on her abilities. Nor has Plaintiff now specifically asserted how the finding impacts her abilities. Therefore, the Court concludes that the Plan reasonably relied on Dr. Graham's and Dr. Chemaly's reports even though they do not explicitly address the finding of severe facet degenerative changes.

The other alleged errors and omissions fare no better. Plaintiff asserts that the reports fail to address her risk of falling and Oswestry spine disability score. But Prudential and the physician reviewers were not required to opine on these items. Prudential and the physician reviewers had to consider all objective evidence to determine whether Plaintiff was able to perform the duties of any occupation. A subjective report of the potential of falling[2] and an Oswestry Score [3] are not

---

[2] Even if Plaintiff's reports of potentially falling were objective evidence, the Plan correctly notes that Dr. Graham acknowledged Plaintiff's report of falling due to pain. Doc. 18 at 6.
[3] An Oswestry score is based on a patient's subjective self-assessment. It is not a physician's medical opinion and does not constitute objective medical evidence. *Ezerski v. Kirlins, Inc.*, No. 3:17-CV-69, 2018 WL 3352945, at *10 n. 6 (S.D. Ohio July 9, 2018) (citation omitted).

objective evidence. Therefore, it was permissible for the physician reviewer reports to not address these items.

Plaintiff also asserts that Dr. Graham's report misstates the thoracic spine CT results. Doc. 14 at 13. Plaintiff says that Dr. Graham noted in his report that the CT showed no stenosis or abnormalities in the thoracic spine when, in fact, the CT showed degenerative disc disease throughout. Doc. 14 at 12. Plaintiff is flatly wrong. Dr. Graham does state in his report that "no stenosis or abnormalities in thoracic spine were noted," but this was a generalized statement made as he gave his conclusion. AR 390. Dr. Graham noted three paragraphs before that the CT of the thoracic spine showed mild degenerative disc disease throughout the thoracic spine. AR 390. The Court is not persuaded that Dr. Graham failed to consider a finding which he correctly noted three paragraphs before.

Finally, Plaintiff asserts that the physician reviewers confused the objective evidence requirement with a requirement of severe impairment. Doc. 14 at 15-16. The administrative record does not support Plaintiff's assertion. The physician reviewers were asked to opine on whether Plaintiff has any medically necessary restrictions and limitations. In doing so, the physician reviewers properly noted the severity of objective findings. They did not, as Plaintiff asserts, require that a finding be labeled as severe to conclude that Plaintiff was disabled.

## VI.    Conclusion

Based on the above, the Plan's decision to terminate Plaintiff's LTD benefits was not arbitrary and capricious. Accordingly, Plaintiff's Motion for Judgment on the Administrative Record, Doc. 14, is **DENIED** and the Plan's Motion for Judgment on the Administrative Record,

Doc. 16, is **GRANTED**. The Clerk of Court is directed to enter final judgement in favor of the Plan.

       **IT IS SO ORDERED**.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: December 10, 2021